UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOANNE MORRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 11 C 0251 |
| | ) |
| MICHAEL J. ASTRUE, | ) Judge Rebecca R. Pallmeyer |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joanne Morris claims she is disabled by coronary artery disease, peripheral vascular disease, and back pain. She seeks review of the Commissioner of Social Security's final decision denying her application for disability insurance benefits under Title II of the Social Security Act. 42 U.S.C. § 423. For the following reasons, the court remands the matter to the Administrative Law Judge ("ALJ") for further consideration.

## PROCEDURAL HISTORY

Morris applied for disability insurance benefits on December 9, 2005,[1] claiming that her disability caused her to cease working on June 1, 2005. (Appl. for Disability Insurance Benefits [8-6] at 81, 83.) The Commissioner of Social Security ("Commissioner") denied Morris's application on July 27, 2006, and denied it again on reconsideration on October 27, 2006. (Notice of Disapproved Claim [8-5] at 51; Recons. Notice [8-5] at 58.) Morris then requested a hearing before an ALJ, which took place on December 4, 2008. (Req. for Hr'g by ALJ [8-5] at 61; Hr'g Notice [8-5] at 67.) In a January 27, 2009 opinion, the ALJ again denied Morris's application for benefits. (ALJ Hr'g Decision at 21-26.) The ALJ determined that Morris "has the residual functional capacity to

---

[1] The ALJ's decision states that Morris first filed for benefits on November 15, 2005 (ALJ Hr'g Decision [8-3] at 21), but the court relies on the date listed on Plaintiff's "Application for Disability Insurance Benefits" and used in her brief, December 9, 2005. (Appl. for Disability Insurance Benefits [8-6] at 81-86.)

perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (*Id.* at 23.) Morris appealed that decision on April 2, 2009, arguing that the ALJ's credibility determination was inconsistent with the factors ALJs must consider in assessing the credibility of a claimant's statements under Social Security Ruling 96-7P. (Representative Br. [8-7] at 148; Request for Review of Hr'g Decision/Order [8-3] at 14.) The Appeals Council denied her request for review on November 10, 2010 (Appeals Council Denial [8-3] at 9), which made the ALJ's denial the final decision of the Social Security Commissioner under 20 C.F.R. § 404.981. Having exhausted her administrative appeals, Morris now seeks review of the Commissioner's decision in this court.

## **FACTUAL BACKGROUND**

According to Morris, she became disabled on June 1, 2005, when she was 56 years old. (Tr. Oral Hr'g [8-3] at 31.) Morris attended school through the tenth grade and has been a widow for sixteen years. (*Id.* at 30-31.) The record contains some contradictory information about her work history. She worked as a self-employed house cleaner beginning in either 1980 or 1985, and stopped cleaning houses in 2000 or was still cleaning houses in December 2005, according to her statements. (Disability Report—Adult [8-7] at 103; Disability Report—Work History [8-7] at 109.) She began working as a nail technician in either 1999 or 2003, and she continued that work until June 1, 2005. (*Id.*) In her application for disability insurance benefits in December 2005, Morris alleged that she worked cleaning houses for no more than one hour per week after June 1, 2005. (Appl. for Disability Insurance Benefits [8-6] at 83.) Later, in a Disability Report on October 12, 2006, Morris asserted that she stopped working completely after December 9, 2005. (Disability Report—Appeals 10/12/2006 [8-7] at 123, 125.)

**I.    Medical History**

Morris asserts that she became disabled on June 1, 2005, primarily from coronary heart disease and a back condition. (Disability Report—Field Office [8-7] at 97; Pl.'s Mot. to Reverse the Final Decision of the Commissioner of Social Security [11], hereinafter "Pl.'s Mot.", at 7.) Morris

2

was first treated for coronary artery disease[2] in 1997, when she was hospitalized for angina requiring primary angioplasty[3] and stent[4] placement, with two stents to the left anterior descending coronary artery and one to the right coronary artery. (Med. Evidence of R. from Provena Mercy Center [8-8] at 152.) On June 8, 2003, she was admitted to the hospital for acute inferior wall myocardial infarction—a "heart attack", or death of heart tissue caused by the abrupt reduction of blood flow to the heart, *The Merck Manual of Diagnosis and Therapy* 636 (Mark H. Beers et al. eds., 2006)—for which she received primary angioplasty. (Misc. Med. Records from Rush-Copley Med. Center [8-8] at 206-07.) Dr. Jaweed Sayeed was her treating physician. (Misc. Med. Records at 206.) After the myocardial infarction, Morris underwent a treadmill stress test administered by cardiologist Dr. K.G. Chua on July 27, 2004, with "normal" results. (Med. Evidence of R. from Dr. Vijay Shah [8-8] at 177.) The test was terminated early, however, due to Morris's leg pains. (*Id.*)

A bilateral lower extremity arterial study[5] on January 21, 2005 showed moderate disease

---

[2] In coronary artery disease, the coronary arteries become blocked due to atherosclerosis, eventually resulting in myocardial ischemia. 7 *Attorney's Textbook of Medicine* ¶ 30.54 (Roscoe N. Gray & Louise J. Gordy, eds., 3d ed. 2010). Atherosclerosis (or atherosclerotic disease) is a condition in which plaques form on the wall of an artery, causing the arterial wall to thicken and become less elastic. *Id.* Myocardial ischemia is an imbalance between the heart's demand for oxygen and the supply of oxygen actually reaching it. *Id.*

[3] During an angioplasty, a thin catheter is inserted into an artery and threaded through the blood vessels. The catheter is then used to clear a narrowed or blocked artery. *The Merck Manual of Diagnosis and Therapy* 598 (Mark H. Beers et al. eds., 2006).

[4] A stent is a tube made of wire mesh that is inserted into a coronary artery to help keep it open. James Wayne Warnica ed., *Overview of Coronary Artery Disease*, The Merck Manual Home Heath Handbook (Feb. 2008), http://www.merckmanuals.com/home/heart_and_blood_vessel_disorders/coronary_artery_disease/overview_of_cornary_artery_disease.html.

[5] A bilateral lower extremity arterial study is a test that measures blood pressures at various levels to detect reduced or blocked arterial blood flow in the legs. *Lower extremity physiologic testing*, UC Davis Vascular Center (last visited Dec. 10, 2012), http://www.ucdmc.ucdavis.edu/vascular/lab/exams/lower_extremity_physiologic.html.

of the right profunda femoris artery[6] and the right dorsalis pedis,[7] left aortoiliac disease,[8] atherosclerotic disease in the left common femoral artery, moderate disease in the distal superficial femoral artery (SFA), popliteal disease,[9] mild disease in the dorsalis pedis and posterior tibial artery, and an ostial localized calcific stenosis with 50-60% luminal reduction in the left profunda femoris artery.[10] (Med. Evidence of R. from Dr. Vijay Shah at 179.)

On February 24, 2005, Morris visited cardiologist Dr. Vijay Shah to follow up on the test results from the bilateral lower extremity arterial study. (*Id.* at 183.) During that visit, Morris reported that she was experiencing a burning sensation in her calves when she walked up stairs or walked quickly, that she could walk just one and a half blocks before the onset of symptoms, and that the burning sensation was relieved with rest. (*Id.*) She also reported that her leg pain limited

---

[6] The profunda femoris artery is also known as the deep femoral artery. 6 *Attorney's Textbook of Medicine*, *supra* note 2, at ¶ 21.32(2).

[7] The dorsalis pedis is the artery of the upper surface of the foot. Merriam-Webster, *Dorsalis Pedis*, Medical Dictionary (last visited Dec. 3, 2012), http://www.merriam-webster.com/medical/dorsalis%20pedis.

[8] Aortoiliac disease is a type of peripheral vascular disease that occurs when the iliac arteries become narrowed or blocked. The iliac arteries branch off from the abdominal aorta, the body's main artery, and run through the pelvis and into the femoral arteries. When the iliac arteries narrow or become blocked, the legs don't receive enough blood and oxygen, which causes pain. Early in the onset of the disease, pain occurs when walking. As the disease progresses, pain occurs upon walking shorter distances or at rest. Society for Vascular Surgery, *Aortoiliac Occlusive Disease*, Vascular Web (Sept. 2009), http://www.vascularweb.org/vascularhealth/Pages/aortoiliac-occlusive-disease.aspx.

[9] The popliteal artery is a continuation of the SFA that starts just above the knee and runs into the lower leg. It supplies the knee, lower leg, and foot with blood. Just below the knee, it branches into the anterior and posterior tibial arteries. 6 *Attorney's Textbook of Medicine*, *supra* note 2, at ¶ 21.23(3).

[10] Ostial means relating to an orifice or opening in a body part (such as a blood vessel). *Dorland's Illustrated Medical Dictionary* 1349 (Daniel Albert et al. eds., 32d ed. 2012). A lumen is the cavity or channel within a tubular organ, such as the lumen of a blood vessel. *Id.* at 1077. Stenosis is the abnormal narrowing of a duct or canal. *Id.* at 1769. Morris's diagnosis of ostial localized calcific stenosis with 50-60% luminal reduction in the left profunda femoris artery therefore meant that her artery had narrowed 50-60% from its original size.

4

her ability to exercise.  (*Id.*)  Her physical examination showed that she was experiencing dyspnea—unpleasant or uncomfortable breathing, *The Merck Manual of Diagnosis and Therapy, supra* note 3, at 357-58—but was negative for other symptoms of health problems.  (*Id.*)

On October 31, 2005, Morris was again treated by Dr. Vijay Shah for angina, and underwent coronary angioplasty and placement of two stents in the obtuse marginal artery.[11]  (Med. Evidence of R. from Provena Mercy Center at 152.)  On the "History and Physical" form for the visit, Dr. Deepa Shah noted that Morris was experiencing exertional dyspnea following her myocardial infarction, and she would become short of breath after taking two flights of stairs.  (*Id.* at 155.)  As set forth in a "Consultation Report" dictated that day, Dr. Vijay Shah's clinical impression of Morris's condition included "progressive exertional angina"[12] and "peripheral vascular disease[13] with left lower extremity most likely SFA (superficial femoral artery) 70 percent stenosis" with "Fontaine type 2" claudication.[14]  (*Id.* at 157.)  Dr. Deepa Shah's diagnoses included unstable angina, known

---

[11]     The obtuse marginal artery is a smaller branch of the main coronary arteries, which deliver blood to the heart muscle.  *Anatomy and Function of the Coronary Arteries*, Johns Hopkins Medicine (last visited Dec. 3, 2012), http://www.hokinsmedicine.org/healthlibrary/conditions/cardiovascular_diseases/anatomy_and_function_of_the_coronary_arteries_85,P00196/.

[12]     Progressive angina, or unstable angina, is an acute coronary symptom most commonly caused by coronary artery disease due to atherosclerosis.  *Unstable Angina*, Medline Plus (last visited Dec. 10, 2012), http://www.nlm.nih.gov/medlineplus/ency/article/000201.htm.  Unstable angina occurs unpredictably in both severity or frequency; attacks may occur without provocation, such as during sleep.  *Dorland's Illustrated Medical Dictionary, supra* note 10, at 83.

[13]     Peripheral vascular disease (also known as peripheral arterial disease) is atherosclerosis of the lower extremities causing ischemia—a deficiency of blood supply due to the obstruction of circulation—in the legs.  *The Merck Manual of Diagnosis and Therapy*, *supra* note 3, at 748; 6 *Attorney's Textbook of Medicine*, *supra* note 2, at ¶ 21.50.  Mild peripheral vascular disease often causes no symptoms; moderate to severe peripheral vascular disease often causes diminished or absent peripheral pulses.  John W. Hallet, Jr. ed., *Peripheral Arterial Disease*, The Merck Manual for Health Care Professionals (Jan. 2008), http://www.merckmanuals.com/professional/cardiovascular_disorders/peripheral_arterial_disorders/peripheral_arterial_disease.html.

[14]     Peripheral artery disease is commonly divided into "Fontaine stages", introduced by René Fontaine in 1954.  Fontaine type 2 is also called intermittent claudication; it is characterized
(continued...)

5

coronary artery disease, and peripheral vascular disease. (*Id.* at 154.) The "Discharge Summary" by Dr. Vijay Shah showed that Morris's condition "may also necessitate some intervention to the lower extremity if her claudication were to be persistent." (*Id.* at 152.)

Accompanying the medical evidence from Dr. Vijay Shah submitted for Morris's case are several pages of handwritten notes dated between 2004 and 2006 that are largely indecipherable. (*Id.* at 184-88.) In January 2005, the record notes that Morris said her "legs hurt when wakes up," that she "has [a] hard time walking," was "very tired," and "[did] not exercise." (*Id.* at 185.) On November 22, 2005, Morris reported she felt "good but very tired" since her stent placement in 2005, and that she had calf pain with "½ block walk." (*Id.* at 187.)

On January 23, 2006, Morris underwent a pharmacologic nuclear stress test, which showed no clinical or EKG evidence of myocardial ischemia, and normal left ventricular systolic function.[15] (*Id.* at 176.) A number of handwritten medical notes, which are largely indecipherable due to handwriting and photocopying, appear to record visits by Morris to Fox Valley Cardiovascular for follow-up and prescription refills on May 25, 2006, June 16, 2006, August 17, 2007, September 18, 2007, September 20, 2007, and other indecipherable dates. (Misc. Med. Records from Fox Valley Cardiovascular [8-8] at 211-13.) A note from June 16, 2006, reads "c/o being tired usually by 2pm and fighting to stay awake around 8pm." (*Id.* at 213.) Medical records also evidence that Morris visited Dr. Vijay Shah on March 18, 2008, June 16, 2008, August 26, 2008, and December 16, 2008. (Misc. Med. Records [8-8] at 215.)

Dr. Vijay Shah wrote in his notes from Morris's August 26, 2008 appointment, "[t]he patient

---

[14](...continued)
by severe pain when walking relatively short distances. *Peripheral Vascular Disease*, Med Quarterly (last visited Dec. 3, 2012), http://medquarterly.com/mg88V2/index.php/learning-notes/2012-02-18-18-22-41/mq-cardiologyvascular/article/9-peripheral-vascular-disease.

[15] Left ventricular systolic function is the contraction of the left ventricle of the heart, which forces the blood into the aorta and the pulmonary trunk. *Dorland's Illustrated Medical Dictionary*, supra note 10, at 1865.

feels well with minor complaints" and "[o]n average, the patient exercises daily (walks for about 20 minutes)." (Misc. Med. Records from Fox Valley Cardiovascular at 208.) He also wrote that Morris was "[p]rimarily here for follow up and Meds." (*Id.* at 210.) A "Review of Systems" examination showed that Morris's systems were normal except for claudication in the musculoskeletal system. (*Id.* at 209.) Dr. Vijay Shah found no leg cramps, muscle weakness, or myalgia (muscle pain). (*Id.*) He diagnosed Morris with coronary atherosclerosis of native coronary vessels, peripheral circulatory disorder, atherosclerosis with intermittent claudication,[16] "MI"[17] to the interiolateral wall of the myocardium, "PTCA/Coronary Atherectomy,"[18] benign hypertension, and mixed hyperlipemia.[19] (*Id.* at 210.) He also noted that Morris would need lab tests and a "Stress Test" in the future, and that, due to financial restrictions, Morris wanted the tests only once a year. (*Id.*)

## II. Morris's testimony

Morris testified before the ALJ on December 4, 2008. (Tr. of Oral Hr'g at 27.) She testified that she was not currently employed, and that she last worked in June of 2005 as a nail technician.

---

[16] Intermittent claudication is a painful, aching, cramping, uncomfortable, or tired feeling in the legs that occurs during walking and is relieved by rest. *The Merck Manual of Diagnosis and Therapy*, *supra* note 3, at 748.

[17] MI is "myocardial necrosis resulting from abrupt reduction in coronary blood flow" to part of the heart muscle known as the myocardium." *The Merck Manual of Diagnosis and Therapy, supra* note 3, at 636.

[18] A coronary atherectomy is a procedure where a cutting device is used to remove plaque buildup from an artery wall. *Atherectomy for Coronary Artery Disease*, WebMD (last visited Dec. 10, 2012), http://www.webmd.com/heart-disease/atherectomy-for-coronary-artery-disease. PTCA, or percutaneous transluminal coronary angioplasty, is a procedure where blocked coronary arteries are opened by inserting a special catheter into the affected artery. *Percutaneous Transluminal Coronary Angioplasty/Stent Placement*, Health Library, Stanford Hospital & Clinics (last visited Dec. 10, 2012), http://stanfordhospital.org/healthLib/greystone/heartCenter/heartProcedures/percutaneousTransluminalCoronaryAngioplastyStentPlacement.html

[19] Hyperlipemia, also known as dyslipidemia, is "an elevation of plasma cholesterol and/or Tgs or a low HDL level that contributes to the development of atherosclerosis." It is diagnosed by measuring plasma levels of total cholesterol, Tgs, and individual lipoproteins, and treated through dietary changes, exercise, and lipid-lowering drugs. *The Merck Manual of Diagnosis and Therapy*, *supra* note 3, at 1296-97.

7

(*Id.* at 31.)  She described her medical history, including hospitalizations for the placement of three stents in 1997, stent occlusion and interior wall myocardial infarction in 2003, and chest pains and stent placement in 2005.  (*Id.* at 32-33.)  She also testified that she saw her cardiologist every six months, and that during those appointments he checked her heart, took blood, and renewed prescriptions.  (*Id.* at 34, 38-39.)

Morris reported that she experienced weakness and fatigue as a result of her heart condition, and could only walk for about half a block or sit for approximately thirty minutes before her legs "start burning."  (*Id.* at 39-40.)  She testified that Dr. Vijay Shah explained to her that her leg symptoms were caused by a blockage in the legs shown by a Doppler test[20] she had in 2005.  (*Id.* at 46.)  She had not had surgery for the condition, and her doctors wanted her to keep trying to exercise.  (*Id.* at 46.)

Morris further testified that her limitations prevented her from working.  Though she had cleaned houses in the past, after her first heart problems occurred in 1997, the work became too physically demanding, she testified.  (*Id.* at 40.)  She went to school to become a nail technician in 1998, but that work became physically challenging as well after her heart attack in 2003.  (*Id.* at 40-41.)  According to Morris, a customer's manicure lasts between 60 and 90 minutes, but she could not sit continuously for that length of time, and required periodic five- to ten-minute breaks because her legs started to burn or fall asleep and her back started to ache, causing significant pain that required her to "walk around" to relieve the pain.  (*Id.* at 41.)  Morris stopped working as a nail technician in June 2005 because of her pain, and because her customers did not want to wait for her to take the breaks she needed in order to complete the work.  (*Id.* at 41-42.)

Morris also described limitations in her daily activities in her testimony: she was "tired all the

---

[20]   A "Doppler test" uses ultrasonography to assess blood flow by measuring changes in the frequency of sound waves reflected from the moving blood source, which provide information about blood flow direction and velocity.  *The Merck Manual of Diagnosis and Therapy*, *supra* note 3, at 2719.

time," and activities like cleaning and doing laundry exhausted her. (*Id.* at 43.) She took naps lasting between ten and fifteen minutes "a couple times a day," and changed positions every 15 to 20 minutes while watching television. (*Id.* at 43-44.) According to Morris, her daughter assisted her with grocery shopping and carrying the groceries, although she could lift a grocery bag "[i]f it's not full of cans." (*Id.* at 45.)

Morris testified that she takes four medications[21] for her heart condition, but her only treatment for her back pain is occasional use of over-the-counter pain medication. (*Id.* at 44.) She also testified that she had medical insurance until April or May of 2008, but it did not cover doctor visits or prescriptions. (*Id.* at 47.) She dropped that insurance in April or May because she could not afford the premiums. (*Id.*) Morris testified that she started receiving widow's benefits when she turned 60 in September 2008, and before that she supported herself through financial support from her daughter and sisters. (*Id.* at 45.) She did not receive any state assistance before she turned 60, according to Morris. (*Id.* at 45-46.) A handwritten medical note from September 20, 2007 entered by an unknown person states, "Pt [Morris's] assistance form for Vytorin 10/10 mailed," (Misc. Med. Records from Fox Valley Cardiovascular at 211), and her medication history, written by Dr. Vijay Shah on August 26, 2008, states, "[r]eceived Plavix 75mg #90 from patient assistance pharmaceutical company." (Misc. Med. Records at 217.)

Morris explained how her condition limited her ability to work in a Disability Report dated May 15, 2006, just prior to the Commissioner's first denial of disability benefits:

> [C]ramping and burning sensations in hands and wrists, difficulty with grasping, drop things, can only lift/carry 10 lbs, cramping and burning sensation in legs and feet, balance difficulties, can only walk/stand up to 5 minutes then need to sit down, constant shortness of breath, constant fatigue/weak, need to take naps during the day, due to fatigue cannot concentrate, back pain with or without activity.

---

[21] According to Morris's most recent medical records, she is taking Atenolol, Enalapril Maleate, Vytorin, Plavix, Ecotrin, and a drug given for a research study. (Misc. Medical Records from Fox Valley Cardiovascular at 208.)

(Disability Report—Adult at 102.) In the accompanying Work History Report from May 26, 2006, Morris expressed the problems she experienced while working as a nail technician:

> [I]t took . . . 2 hours per client, I found myself fighting to stay awake, and having to get up and walk around because of the pain in my legs from the lack of circulation. It was also very hard to concentrate on . . . doing the nails. Which in turn took longer, and clients kept going elsewhere, because I took too much time for their service. In June 2005, I finally quit all together [sic], it was just to [sic] exhausting to try to do the work professionally.

(Disability Report—Work History at 110, 116.) On an "Activities of Daily Living Questionnaire" from May 26, 2006, Morris wrote that she experienced burning in her calves when going up and down stairs, and that she could climb approximately seven stairs before the burning started. (Activities of Daily Living [8-7] at 118.) She wrote that she could sit for only 15 to 20 minutes before her legs started to burn, that she could stand for only 30 minutes at a time, and that she needed to take rest periods every two to three hours for 20 minutes. (*Id.*)

### III. Evaluation and Testimony by Outside Physicians

On July 5, 2006, Dr. Zain Syed, an internist, completed a consultative examination report on behalf of the Illinois Bureau of Disability Determination Services. (Consultative Examination Report [8-8] at 189-194.) Dr. Syed reported that Morris's complaints included aches and pains in the lower extremities, memory loss, and extreme fatigue. (*Id.* at 191.) He wrote that Morris "is not able to do any work," "has to take a rest every two hours," "was taking a long time to finish her work and she lost clients because of her slow performance," "is not able to stand long hours and cannot remain awake and feels sleepy all the time," and "is slow in doing her daily activities which take forever to finish." (*Id.*) Dr. Syed also wrote that Morris was diagnosed with peripheral vascular disease, needed to rest after walking half a block, experienced a "burning feet sensation," and could not stand long enough to complete chores. (*Id.* at 191-92.) Dr. Syed's notes from his physical examination of Morris were:

> Chest negative for any deformity or tenderness. Heart positive for S1, S2.[22] Lungs negative for any wheezes or crackles.… cold lower extremities with prolonged capillary refill. Absent dorsalis pedis on both sides. Tibialis posterior present on the right side and left was negative. Motor strength and sensation were grossly normal and range of motions of the joints was grossly normal.

(*Id.* at 192.) Dr. Syed's clinical impression of Morris was that she had coronary artery disease, extreme fatigue, peripheral vascular disease, a history of dyslipidemia, and hypertension. (*Id.*)

On July 14, 2006, Dr. Ernst Bone evaluated Morris's medical records in order to complete the Physical Residual Functional Capacity ("RFC") Assessment for the Social Security Commission; he never personally examined Morris. (Physical RFC Assessment [8-8] at 195-202.) The RFC assessment identifies Dr. Bone only as a "medical consultant." (*Id.* at 202.) The form for the assessment instructed Dr. Bone to "[b]ase your conclusions on all evidence in file," and "[d]escribe how the evidence substantiates your conclusions." (*Id.* at 195.) Dr. Bone concluded that Morris could occasionally lift twenty pounds, could frequently lift ten pounds, could stand for six hours in an eight-hour workday, and could sit for six hours in an eight-hour workday. (*Id.* at 196.) To support his conclusions, Dr. Bone recited some the physical exam results recorded by Dr. Syed in his July 5, 2006 report and added, "Full range of motion all joints. Ambulation without an assistive device. . . . [L]imited to light work." (*Id.* at 202.) Dr. Bone provided no further explanation for his RFC assessment.

Finally, Dr. Virgilio Pilapil completed a medical evaluation of Morris's file on October 25, 2006, pursuant to Morris's request for reconsideration of her application to the Commissioner. (Med. Eval./Case Analysis [8-8] at 203-205.) Dr. Pilapil's evaluation also identifies him only as a medical "consultant." (*Id.* at 204.) After reviewing the evidence in the record, Dr. Pilapil affirmed

---

[22] S1 and S2 are the two sounds that make up a heart beat. The first heart sound (S1) is caused by the closure of the mitral and tricuspid valves, and the second sound (S2) is caused by the closure of the aortic and pulmonic valves. *Technique: Heart Sounds & Murmurs*, University of Washington Dept. of Medicine: Advanced Physical Diagnosis (last visited Dec. 3, 2012), http://depts.washington.edu/physdx/heart/tech.html.

Dr. Bone's residual functional capacity assessment because no additional evidence was presented. (*Id.* at 204-05.)

## IV.     The Administrative Law Judge's Findings

On January 27, 2009, the ALJ issued his decision, finding Morris not disabled under § 216(I) and § 223(d) of the Social Security Act. (ALJ Hr'g Decision at 25-26.) The ALJ found that Morris met the insured status requirements and had not engaged in substantial gainful activity since June 1, 2005, the date of the onset of her disability. (*Id.* at 23.) The ALJ also determined that Morris was severely impaired by "status post myocardial infarction and stent implants causing a significant limitation to the strength demand of physical activity." (*Id.*) The ALJ nevertheless found that Morris did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpt. P, App. 1. (*Id.*) Specifically, the ALJ found that "medical listing 4.04, which addresses ischemic heart disease and symptoms related to myocardial ischemia" was not satisfied. (*Id.*)

Next, the ALJ found that Morris had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (ALJ Hr'g Decision at 23.) Although Morris testified that she could not sit for the time required to complete a client's nails because of the pain in her legs (Pl.'s Mot. at 12), the ALJ found that Morris was capable of performing the full range of sedentary work, which requires sitting for approximately six hours in an eight-hour workday. SSR 96-9p, 1996 WL 374185, *3 (July 2, 1996). Sedentary work includes jobs that require lifting no more than ten pounds at a time, occasionally lifting or carrying small articles, and walking and standing only occasionally. 20 C.F.R. § 404.1567(a). The ALJ based his residual functional capacity determination on his finding that although Morris's "impairments could reasonably be expected to cause the alleged symptoms," Morris's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible." (ALJ Hr'g Decision at 25.) The ALJ explained that he did not fully credit Morris's testimony because she did not report

her limitations to her treating cardiologist, Dr. Vijay Shah. (*Id.*) The ALJ also noted that Morris's statement that she could only walk for short distances was "discredited by her statement to Dr. Shah on August 26, 2008 that she walked daily for 20 minutes," and "[t]he physical limitations she alleged in her testimony are not supported by the testing or physical examinations." (*Id.*)

Finally, the ALJ found that Morris was capable of performing her past relevant work as a nail technician. (*Id.*) Based on Morris's testimony, he found that the job "required her to sit for three to five hours a day, crouch and handle small objects," and "perform[] services such as buffing, filing, and shaping clients' nails." (*Id.*) He determined that Morris was capable of performing the full range of sedentary work, and, therefore, that the physical and mental demands of the nail technician job did not exceed Morris's residual functional capacity. (*Id.*)

## **DISCUSSION**

### I.     **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. 42 U.S.C. § 405(g). In assessing the ALJ's decision, the court will not "reweigh the evidence or substitute [its] own decision for that of the ALJ." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Rather, the court must determine whether the ALJ's findings are supported by "substantial evidence." *Id.* (quoting 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ need not address every piece of evidence in the record, but "must connect the evidence to the conclusion; in doing so, [the ALJ] may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). Although the ALJ's disability determination is reviewed deferentially, the court "must do more than merely rubber stamp the [ALJ's] decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2012) (internal quotation marks and citations omitted). The court must decide "whether the ALJ's determination was reasoned and supported," though it

13

will not overturn an ALJ's credibility determination "unless it is patently wrong." *Shideler*, 688 F.3d at 311 (internal quotation marks and citations omitted).

**II.     Analysis**

The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Social Security regulations provide a five-step test to determine whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920. This test requires the ALJ to consider:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1 and meets the duration requirement; (4) whether the claimant is capable of performing her past relevant work; and (5) whether the claimant has the ability to perform other work in the national economy.  *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).  The claimant bears the burden of proof in steps one through four, and the Commissioner bears the burden of proof at step five.  *Id.*

For steps four and five of the disability analysis, the ALJ must determine the claimant's residual functional capacity based on relevant evidence in the record.   *See* 20 C.F.R. §§ 404.1520(e), 404.1560(b)-(c).  Residual functional capacity "is the most [the claimant] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  If, at step four, the ALJ finds that the claimant has the residual functional capacity to perform her past relevant work, she is not disabled. *Weatherbee*, 649 F.3d at 569.  If the claimant cannot perform her past relevant work, the ALJ proceeds to step five of the analysis.  *See* 20 C.F.R. § 404.1520(f)-(g).  If the ALJ finds that the claimant's residual functional capacity, age, education, and work experience preclude her from performing other work in the national economy, she is disabled.  *Weatherbee*, 649 F.3d at 569.

Morris argues that the ALJ's finding at step four, that she could perform her past relevant

work as a nail technician, is not supported by substantial evidence. (Pl.'s Mot. at 11.) She claims that her testimony and the ALJ's findings establish the need for a "sit/stand option." (Pl.'s Mot. at 12.) The Commissioner contends that "Morris was not credible in her claims of limitations greater than a full range of sedentary work," including the need for a "sit/stand option", because those claims were inconsistent with her medical history. (Def.'s Resp. to Pl.'s Mot. for Summ. J. [22], hereinafter "Def.'s Resp.", at 3.)

In determining Morris's residual functional capacity, the ALJ found that her impairments "could reasonably be expected to cause the alleged symptoms." (ALJ Hr'g Decision at 25.) The ALJ also determined, however, that Morris's statements concerning the limiting effects of her symptoms were not credible because "the level of limitation was not reported to Dr. Shah" and because her claimed limitations "[were] not supported by the testing or physical examinations." (*Id.*) In rejecting Morris's testimony about her weakness and fatigue when walking short distances and her inability to sit or stand for long durations, the ALJ focused on Morris's last medical evaluation with Dr. Vijay Shah on August 26, 2008. Specifically, the ALJ relied on Dr. Vijay Shah's record from the August 26, 2008 evaluation[23] that Morris reported she felt well and exercised daily for twenty minutes, and on the results of Morris's physical examination showing she was "essentially normal." (ALJ Hr'g Decision 24.) The ALJ also referred to Morris's pharmacologic and treadmill stress tests, both of which showed "normal" results, and observed that she had not been treated on an inpatient basis since October 2005. (*Id.*)

In making a credibility determination, the ALJ is required to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Shideler*, 688 F.3d at 311 (internal quotation marks and citations omitted). In addition to the evidence noted by the

---

[23] The ALJ wrote that the relevant appointment occurred on September 21, 2006, but the medical records show it occurred on August 26, 2008. (Misc. Med. Records from Fox Valley Cardiovascular at 208.)

15

ALJ, Dr. Vijay Shah's August 26, 2008 evaluation recorded that Morris was experiencing claudication and had peripheral circulatory disorder and atherosclerosis with intermittent claudication. (Misc. Med. Records from Fox Valley Cardiovascular at 209-10.) On October 31, 2005, Dr. Vijay Shah had diagnosed Morris with "Fontaine type 2" claudication (Med. Evidence of R. from Provena Mercy Center at 157). Handwritten medical records from 2005 also showed that Morris experienced pain from walking short distances. (Med. Evidence of R. from Dr. Vijay Shah at 183, 185, 187.) In his July 5, 2006 report summarizing his examination of Morris, Dr. Syed noted Morris's extreme fatigue and her difficulty walking short distances. (Consultative Examination Report at 192.) The medical records therefore establish that Morris did report leg pain and difficulty walking to doctors on several occasions, including on her August 26, 2008 visit to Dr. Vijay Shah. (Misc. Med. Records from Fox Valley Cardiovascular at 208-10.) Though Morris reported to Dr. Vijay Shah that she felt well on August 26, 2008, and her test results were "normal" on some occasions, the ALJ may not consider that evidence in isolation from other relevant evidence in the record. *See* SSR 96-7p, 1996 WL 374186, *4 (July 2, 1996).

The ALJ also did not credit Morris's testimony about her difficulty walking, in part because on August 26, 2008 she told Dr. Shaw that she walked daily for twenty minutes. (ALJ Hr'g Decision at 25.) That piece of evidence alone, however, does not undermine Morris's claimed difficulty with walking. Dr. Vijay Shah's report did not specify what distance Morris was able to cover in twenty minutes, nor whether she was able to walk for a consecutive twenty minutes. (Misc. Med. Records from Fox Valley Cardiovascular at 208-13.) Dr. Vijay Shah noted during that same visit that Morris experienced claudication (*Id.* at 209-10), and Morris later testified that in order to treat the symptoms in her legs, her doctor wanted her "to just keep trying to exercise." (Tr. Oral Hr'g at 46.) In *Carradine v. Barnhart*, a case cited by neither party, an ALJ doubted the claimant's testimony about the severity of her back pain because he found her testimony inconsistent with evidence that she took walks of up to two miles. 360 F.3d 751, 754-55 (7th Cir. 2004). The court in *Carradine*

held that since the claimant's doctors had prescribed exercise for her pain, her ability to take walks was not inconsistent with suffering severe pain. *Id.* at 755. Here, similarly, Morris's twenty minutes of daily exercise may reflect her efforts to comply with treatment advice, rather than evidence that her claims about the severity of her pain were not credible.

The ALJ also rejected Morris's claims that she had difficulty walking and could only sit or stand for short durations because he found that neither the testing nor the physical examinations supported them. (ALJ Hr'g Decision at 25.) The Commissioner argues in his brief that although the medical evidence showed that Morris experienced pain while walking, there is nothing in the record that would explain her difficulty sitting. (Def.'s Resp. at 4.) An ALJ is not permitted, however, to "discredit testimony of pain solely because there is no objective medical evidence to support it." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *see also* C.F.R. § 404.1529(c)(2). Neither the medical reports nor Morris's reported account of walking for twenty minutes per day are inconsistent with her claims of pain. The ALJ failed to offer sufficient reasons for rejecting Morris's claims, and therefore erred in discrediting her testimony.

Morris also argues that the evidence established the need for a "sit/stand option", and that the ALJ should have used a vocational expert to determine whether she was able to perform her past work as a nail technician with that option. (Pl.'s Mot. at 12-13.) In response, the Commissioner argues that the ALJ had no obligation to seek vocational expert testimony. (Def.'s Resp. at 4.) ALJs do often rely on vocational experts to determine whether the government has met its burden of proving that the claimant's residual functional capacity allows her to perform work that exists in the national economy. *Weatherbee*, 649 F.3d at 569. The question whether to do rely on an expert is, however, "a matter entrusted to the discretion of ALJs." *Id.* The ALJ's decision not to use a vocational expert in this case can be explained by the fact that he concluded his inquiry at step four of the five-step test, and therefore had no need to determine whether Morris could perform other work that exists in the national economy. On remand, the use of a vocational expert

may be useful if the analysis progresses to step five.

## **CONCLUSION**

For the reasons stated above, the court remands Plaintiff's disability claim for further proceedings consistent with this opinion.

ENTER:

Dated: December 20, 2012

_____
REBECCA R. PALLMEYER
United States District Judge